# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 0:14-CV-60604-KMM

*Gay, et al.,*

**OBJECTION AND NOTICE OF INTENT TO APPEAR**

*Plaintiff,*

*vs.*

*Tom's of Maine, Inc.,*

*Defendant.*

FILED by _____ D.C.

DEC 0 1 2015

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

Page 1

**COMES NOW**, absent class member, Steven Franklyn Helfand [hereafter "Helfand"],[1] by and through himself, in *propria persona*, and objects to the proposed class action settlement [hereafter the "Settlement"] as follows:

## I.   OBJECTIONS

### A. Introduction

The Court should decline to grant final approval to this proposed class action settlement.  Class counsel seek to reap over one million dollars in fees while keeping class members in the dark as to the existence of their so-called "clear-sailing" agreement.[2]

---

[1] Helfand is a member in good standing of the State Bar of California.  Helfand purchased countless products from Tom's of Maine in light of his chronic health condition which made him particularly vulnerable.

[2] The settlement contains a warning sign of an unfair deal: a "clear sailing" agreement. *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).  A clear sailing clause stipulates that attorney awards will not be contested by opposing parties.  "Such a clause by its very nature deprives the court of the advantages of the adversary process." *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991). The clause "suggests, strongly," that its associated fee request should go "under the microscope of judicial scrutiny." *Id.* at 518, 525; *Childs v. United Life Ins. Co.*, No. 10-CV-23-PJC, 2012 U.S. Dist. LEXIS 70113, at *13-*14 & n.6 (N.D. Okla. May 21, 2012). The clear sailing clause lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Weinberger*, 925 F.2d at 524; accord *Bluetooth*, 654 F.3d at 948. *Gooch v. Life Investors Ins. Co. of Am.* found that a clear-sailing agreement that awarded class counsel disproportionate fees could be evidence of settlement unfairness. 672 F.3d 402, 425 (6th Cir. 2012) (finding potentially problematic clear-sailing clause

According to the settlement proponents, ninety-seven to ninety-nine percent of Class members are expected to take a pass on participation, less than half the weighted average claims filing rates for consumer settlements. The settling parties offer no suggestions to improve the expected claims rate through, for example, reconfiguration of notice or revamped administration procedures.

The settling parties ensnared class members with a convoluted claims process and misleading settlement notice, ensuring the real beneficiary of this settlement is the liberal advocacy behemoth, "Consumer (sic) Union"[3] along with Class counsel. Consumers Union is not shy about weighing in on controversial political matters. It previously supported Obamacare. Exhibit A, pp. 1-3. It has supported cap and trade. It opposed the Keystone Pipeline. It opposes fracking. There are countless other examples. Exhibit A, pp. 4-11. Free speech is a wonderful thing. This objection does not take issue with Consumers Union right, guaranteed by the Constitution, to pursue whatever political or social policies it finds appropriate. By the same token, class members have Constitutional rights as

---

acceptable because class counsel received only 2.3% of settlement value; reversing on other grounds).

[3] The correct name of the organization is "Consumers Union," not "Consumer Union." The incorrect spelling in the S.A. confirms the *cy pres* beneficiary met little rigorous analysis by the settling parties.

well; they may not be compelled to fund political advocacy of any stripe. Put even more simply, Consumers Union free speech should not be underwritten by the class.

Seeking to cloak a botched case, likely poor results and defeat transparency, the claims period is to remain open until May 7, 2016. The final approval hearing is January 28, 2016. What is the real urgency? The existing time schedule order makes it virtually impossible for the Court to ascertain precise individual recoveries, let alone, assess accurate claims data or analyze how much class money is to be misdirected to political speech. An "ostrich head in the sand" approach is not justified.

The Court has a choice. It can, as urged by the settling parties, close its eyes to reality, defer to settling counsel and reflexively adopt the unsupportable notion that this settlement provides a benefit to class members. Or it can, as required by Fed. R. Civ. P. 23, scrutinize the facts, closely inspect the terms of settlement, and demand explanations and evidence from the settling parties, all to faithfully discharge its fiduciary duty to class members and ferret out the true state of affairs.

## B. Overview

The proposed agreement is for settlement purposes only; no class was previously certified.  Settlement Agreement [hereafter "S.A."], § 3, ¶ 1, p. 15.  The S.A. purports to create a settlement fund of $4.5 million from which eligible claims, attorneys fees and expenses, costs of notice and class administration and service awards are deducted.  S.A., § 2, ¶ 39, p. 14.  "The Settlement Fund is non-revisionary, and any monies remaining in the Settlement Fund after all Eligible Claims have been paid will be distributed through a *cy pres* process to an entity mutually agreed to by the Parties and approved by the Court."  S.A., § 2, ¶ 39, p. 14.

### 1. <u>Class Benefit</u>

A Settlement Class Member is eligible to obtain up to or greater than $4.00 for each purchase of a Covered Product for up to seven (7) Covered Products. S.A., § 4, ¶ 4, p. 18.  Covered Products include a variety of personal hygiene products, including, deodorant, soap, sunscreen, lip balm, etc.  S.A., § 2, ¶ 16,  p. 9. [4]

---

[4] This case falls far short in compensating class members.  For example, a class member, like Helfand, covered product purchases amount to several each month. This means at least 390 covered purchases over the class period - not just seven - or even fourteen.   In other words, the S.A. provides scant relief when contrasted

The S.A. offers token injunctive relief.  S.A., § 4, subdivision B, pp. 19-20.

If the total amount of timely, valid and approved eligible Claims submitted results in there being any remaining value in the Net Settlement Fund, it shall be used to increase the relief of up to one hundred percent.   S.A., § 4, subdivision C, p. 21.

### 2. *Cy Pres* Beneficiary is Consumers Union

Any amount remaining after distributions in the Net Settlement Fund shall, subject to Court approval, be paid to Consumers Union.  S.A., § 4, subdivision C, pp. 22.  There is no way to know, at the time of final approval, precisely how much money, if any, Consumers Union shall receive.

### 3. Consumers Union Is a Progressive Organization Outside the Mainstream of American Politics

Consumers Union has an untapped $150 million war chest, making it the least likely candidate to be selected if based on need alone.  Exhibit A, pp. 28-39. The related website of Consumers Union, ConsumerReport.org claims more paid subsribers than any other publication based websiter.  **Most of its information is available only to paid subscribers**. Ex. A, p. 53-54.  How class members fit into

---

with actual purchases.  Class members who were cheated the most get the least; class members with only a handful of purchases reap the most.

this subscription base is unknown.  What benefit the class shall gain is also unknown.  Consumers Union has used its resources to push for politically divisive issues; including endorsing the Affordable Care Act.  It leadership is decidedly left.  Exhibit A, pp. 40-48.

This Court should be hesitant to allow Class proceeds to be directed to political advocacy which is precisely what Consumers Union does.  *Consumer Reports* magazine has a reputation, as a consumer champion, providing unbiased reviews of products and services.  Unknown to many, however, is *Consumer Reports* magazine's direct link to a larger organization with a liberal policy agenda that openly advocates for progressive causes.

*Consumer Reports* (and its website) is a division of Consumers Union, a consumer advocate organization founded in 1936.  According to their mission statement, the union works "for a fair, just, and safe marketplace for all consumers and to empower consumers to protect themselves."  While some of the efforts of Consumers Union have been constructive and nonpartisan, there have been many instances of a decided progressive agenda.

The line between the efforts of Consumers Union and the readership of Consumer Reports is murky, as the union has openly advocated, for issues directly to the readers.  In October 2009, for example, Consumers Union sent out a mass

email from Consumers Union President Jim Guest to paid members of Consumer Reports.org, asking them to support health care reform. A link in the email directed them to a website, PrescriptionforChange.com, where readers could sign an online petition that was later presented to members of Congress.

While the email did not specifically advocate for ObamaCare, the language used, sounded like President Obama's talking points for his plan. Consumers Union stated: "In the health care reform we envision, you can keep good insurance coverage if you've got it, or choose reliable alternatives that cover what you need at affordable rates. No one is denied for pre-existing conditions; no one goes bankrupt because of illness...insurance companies should be required to take all applicants (sic), employers should be required to cover their employees or pay into the system, and we need to allow people to buy into something like Medicare." The implied support of President Obama's reform plan may be due to the fact that many of the Consumers Union staff have extensive connections to the Obama Administration.

For instance, Consumers Union Board Member and liberal provocateur, Micah Sifry, is a former writer for the liberal magazine, The Nation. Mr. Sify had stints working for Howard Dean and Dick Gephardt, hardly known as nonpartisan or independent politicians worthy of being stewards of class proceeds. Mr. Sify

has mused: "**You know our awful governor Andrew Cuomo is a manipulative, lying control freak . . .**" November 2, 2014, Micah.Sifry.com (emphasis added). Exhibit A, pp. 14-19. Ms. Sifry concedes his oversight is far from neutral, claiming that "civic tech cannot be neutral."

Board Member, Heather McGhee is from a group called *Demos. Demos* claims: "We champion ideas powerful enough to improve the lives of millions, shift the narrative to clear the way for their acceptance, and advocate until they take effect. We use the right strategy for the right moment, whether it's research or communications, supporting organizers or litigating. This commitment to the full cycle of change has resulted in real victories, such as landmark credit card reforms and nearly 2 million new low-income voter registrations." Championing "ideas" with which class members may disagree is entirely appropriate; just not with class money.

Board member Marcia Aronoff serves as Vice President of Programs of Environmental Defense Fund, Inc. Ms. Aronoff serves as Director of Consumers Union of U.S., Inc. She served as the Chief of staff for former U.S. Senator Bill Bradley from 1978 to 1991. Ms. Aronoff supports cap and trade and so does Consumers Union. What assurances do class members have that its money is not devoted to further the progressive/left-wing environmental agenda? None.

Yet another board member of Consumers Union is a well-known, anti-American agitator, running the so-called "Center for Investigative Reporting." One recent so-called "expose" was an anti-American rant, dated October 15, 2015, and purports to blame the United States of America for the origin of a "modern day surveillance state" and its manipulation of the global population through a variety of channels, including cell-phones. Exhibit A, pp. 20-27. Frankly, these positions are offensive and should offend the sensibilities of this Court.

Board member, Annette LoVoi, is from a group that calls itself, "National Appleseed." Its strategy is to "focus on broad systemic social initiatives, rather than the traditional model of providing legal services to individuals." The group embraces socialism. See Exhibit A, p. 12-13.

Chairperson of Consumers Union Board, Diane Archer, is a founder of the so-called "Medicare Rights Center." One of the primary tasks of this group is social policy initiatives designed to promote the expansion of Medicare and adoption of a single payer health care system.

Reasonable people might tend to disagree. The Court should not wade into the dangerous arena of funding politically motivated speech with class money.

### 4. Notice Shortcomings

The Notice fails to disclose Consumers Union as the *cy pres* beneficiary.
Notice, *generally*.

The S.A. includes a so-called "clear-sailing" provision in which "Class
Counsel shall make, and Tom's agrees not to oppose, an application for an award
of Attorneys' Fees and Expenses not to exceed $1.5 million." S.A. § X, ¶ A, p. 39.
The Notice fails to disclose the clear-sailing provision. Notice, *generally*.

A substantive requirement of the Long Form Notice includes that it "explain
the scope of the release." S.A., § VII, subdivision B, p. 30. The Release is
reflected at S.A. § IX, pp. 35-39. The Notice merely states as to the release: "**In
return for these benefits, what am I giving up?** If the Court approves the
proposed settlement and you do not request to be excluded from the Class, you
must release (give up) all claims that are subject to the Release, and the case will
be dismissed on the merits and with prejudice. **If you remain in the Class, you
may not assert any of those claims in any other lawsuit or proceeding. This
includes any other lawsuit or proceeding already in progress.**" Notice, § 17, p.
6. The scope of the release is not discussed. Notice, *generally*.

The Notice provides, "The Claims Administrator's determination [on a
claim] is final. Neither you nor Tom's can appeal or contest the decision of the

Claim (sic) Administrator." Notice, § 8, p. 4. The S.A. does not preclude appeal. S.A., *generally*. On the contrary, the Court expressly retains jurisdiction as to the implementation and enforcement of the terms of the Agreement. S.A., § XV, ¶ P, p. 48.

The Notice misconstrues the Objection Procedure. Compare, S.A. § VIII, pp. 32-33; Notice, § 20 ["Be sure to include your name, address, telephone number, your signature, and *a statement under penalty of perjury that you are a member of the Class* (i.e., that you purchased one of the Covered Products during the class period.")]. This is not required. S.A. § VIII, pp. 32-33.

### 5. **Claim Form Violates the S.A.**

The claim form omits the required "penalty of perjury" attestation. S.A. § V, ¶ A, p. 22 ["The Claim Form shall be signed under an affirmation stating the following or substantially similar language: 'I declare, **under penalty of perjury**, that the information in this Claim Form is true and correct to the best of my knowledge, and that I purchased the Covered Products claimed above during the Class Period for personal or household use and not for resale. I understand that my Claim Form may be subject to audit, verification, and Court review.'"] (emphasis added). This failure shall likely corrupt the claims process. Ex. A, pp. 49-50.

Affirmation, "under penalty of perjury," is not required to file a claim and receive cash; it is only required, according to Class counsel, to voice criticism. Class counsel has it backwards.

### 6. **Class Size is Unascertainable**

The Settlement Administrator [hereafter "Dahl"] states, "I understand that Settlement Class members generally are persons in the United States who purchased Tom's of Maine 'natural' products between March 25, 2009 and the date the Court enters the Preliminary Approval Order. **It is not possible to determine the Settlement Class size because no mechanism exists to track exactly how many households have purchased Tom's of Maine 'natural' products**. However, estimates from GfK MRI and comScore indicate that there are approximately 11.6 million purchasers of these products. Thus, the best ballpark estimate that exists is that membership in the Settlement Class may include approximately 11.6 million persons." Affidavit of Jeffrey D. Dahl with Respect to Settlement Notice Plan [hereafter "Dahl Decl."], ¶ 11, pp. 3-4 (emphasis added).

### 7. **Expected claim rate gloomy**

Page 13

Dahl expects that "[a] claim filing percentage of 1% to 3% would be reasonable." Dahl Decl., ¶ 33, p. 11.[5]

Dahl shall provide periodic updates regarding claim form on a weekly basis after September 23, 2015. S.A., § 5, subdivision C, p. 23.[6]

---

[5] *DeLeon v. Bank of Am.*, No. 6:09-cv-1251, 2012 U.S. Dist. LEXIS 91124, at *62 (M.D. Fla. Apr. 20, 2012) (finding that a low-value claims-made settlement would "surely result in a low claims rate" and rejecting the claims procedure as "not reasonable"). Empirical evidence reveals claims rates in these types of consumer settlements are exceedingly low. See *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (en banc) (noting evidence that "consumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns."). If recent cases are any indication, the rate will likely be well below 7%, perhaps even under 1%. See *Spillman v. RPM Pizza, LLC*, No. 10-349-BAJ-SCR, 2013 U.S. Dist. LEXIS 72947, at *8 (M.D. La. May 23, 2013) (.27% claims rate); *Lagarde v. Support.com, Inc.*, No. 12-0609 JSC, 2013 U.S. Dist. LEXIS 67875, at *7 (N.D. Cal. May 13, 2013) ("[A] mere 1,259 timely claims were submitted for the $10 refund, which represents 0.17% of the total number of class members and 0.18% of the total number of class members who received notice."); *In re Livingsocial Mktg. & Sales Practices Litig.*, MDL No. 2254, __F.R.D__, 2013 U.S. Dist. LEXIS 40059, at *52 (.25% claims rate). These rates accord with intuition. See *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 952 (7th Cir. 2006) ("Given the tiny sum per person, who would bother to mail a claim?"). Naturally low claims rates are the "[t]he reality" here, and mean that "this settlement benefits class counsel vastly more than it does the consumers who comprise the class." *Pampers*, 724 F.3d at 721.

[6] The parties may retort that a claims process is unexceptional in class action settlement administration. As a general matter they are correct, but in this particular context they are not. When a claims-made process is employed—in lieu of direct payment mechanisms—the court should assure itself that there is a valid reason for its use. Often, a claims-made structure can be justified by the fact that the defendant either is unable to identify specific class members or is unable to identify the value of those class members' claims. Helfand questions the need for a statement on the Claim form averring that it is made "under penalty of perjury."

## II.   DISCUSSION

### A.  Notice is not adequate

A notice may not be misleading.  The notice is misleading.  It violates due process and Fed. R. Civ. Proc., Rule 23.  *Molski v. Gleich* (9th Cir. 2003) 318 F.3d 937, 952 [Notice is not adequate if it misleads the class]; *In re Motor Fuel Temperature Sales Practices Litig.*, 286 F.R.D. 488, 504 (D. Kan. 2012) (denying approval where *cy pres* beneficiaries were not designated); see also, *In re Thornburg Mortg., Inc. Secs. Litig.*, 885 F. Supp. 2d 1097, 1111 (D.N.M. 2012) (outlining *cy pres* defects).

### B.  Settlement class cannot be certified

"Class-action settlements are different from other settlements."  *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013).[7] "[I]n class-action settlements

---

However, both the S.A. and preliminary approval order entered by this court required it.

[7] "The parties to an ordinary settlement bargain away only their own rights—which is why ordinary settlements do not require court approval. In contrast, class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations. And thus there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *Pampers*, 724 F.3d at 715. "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are

the district court cannot rely on the adversarial process to protect the interests of the persons most affected by the litigation—namely, the class. Instead, the law relies upon the fiduciary obligations of the class representatives and, especially, class counsel, to protect those interests. And that means the courts must carefully scrutinize whether those fiduciary obligations have been met." *Id.* at 718. (internal quotation omitted).[8] Thus, through its oversight responsibility, the court itself assumes a derivative fiduciary obligation to the class. *McNeil v. Guthrie*, 945 F.2d 1163, 1167 (10th Cir. 1991); *Gottlieb v. Barry*, 43 F.3d 474, 490 (10th Cir. 1994) ("[T]he importance of safeguarding the class' interests cannot be underestimated."). This judicial duty to vouchsafe the rights of the absent plaintiffs extends to the decision to grant class certification, obliging district courts to

---

behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697 (9th Cir. 1992).

[8] "In reviewing a proposed settlement, a court should not apply any presumption that the settlement is fair and reasonable." Am. Law Institute, Principles of the Law of Aggregate Litig. § 3.05(c) (2010) ("ALI Principles"). "The burden of proving the fairness of the settlement is on the proponents." *Pampers*, 724 F.3d at 718 (compiling cases and authorities). In this case, that burden is yet heightened because this settlement has been proposed before class certification. Delaying certification until settlement poses various problems, see *In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 786-800 (3d Cir. 1995) ("GM Trucks"), and calls for heightened judicial scrutiny of the certification and the accompanying settlement. *Id.* at 807; *Pampers*, 724 F.3d at 721; Federal Judicial Center, Manual for Complex Litigation § 21.612 (4th ed. 2004).

conduct a "rigorous analysis" to ensure compliance with the Rule 23 certification prerequisites. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). A proponent of class certification "must affirmatively demonstrate his compliance with the Rule." *Id.*

Aside from trial manageability concerns, that burden is no lighter when the Court is confronted with a settlement-only class certification. In fact, the specifications of rules Rule 23(a) and (b)(3) are "designed to protect absentees by blocking unwarranted or overbroad class definition" and "demand undiluted, even heightened, attention in the settlement context." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); see also *Pampers*, 724 F.3d at 721 ("These requirements are scrutinized more closely, not less, in cases involving a settlement class"); *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 380 (3d Cir. 2013) (the "policy in favor of voluntary settlement does not alter the 'rigorous analysis' needed to ensure that the Rule 23 requirements are satisfied."). Put another way, "it is not the mission of Rule 23(e) to supply the cohesion that legitimizes a settlement-only class action." *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 451 (4th Cir. 2003) (Niemeyer, J., concurring in part and dissenting in part). Fed. R. Civ. P. 23(b)(3) allows a class action to be maintained if 23(a)(1)-(4) are satisfied, "questions of law or fact common to class members predominate over any questions affecting

only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The burden of proving these prerequisites resides with the proponents of certification. *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013).

The proposed settlement class falls short.

Rule 23(b)(3) requires the parties to demonstrate the superiority of the class action device for adjudication of class members' claims. As discussed below, where it is impracticable or impossible for class members to attain any compensatory benefit from the class action, 23(b)(3) superiority is not satisfied. Where "individual distributions to class members are not feasible" because class members "cannot be identified through reasonable effort," "individual damages would be if not impossible to calculate" and "individual distributions would be too small to be economically viable," certification is not appropriate. The S.A. fails to square with any of these concerns.[9]

---

[9] See, e.g., *Supler v. FKAACS, Inc.*, No. 5-11-CV-00229-FL, 2012 U.S. Dist. LEXIS 159210, at *10- *11 (E.D.N.C. Nov. 6, 2012) (holding that, because "benefits to putative class members" from cy pres payments "are attenuated and insignificant…, class certification does not…promote judicial efficiency.") (internal quotations, ellipses, and citations omitted); see also *Quinn v. Nationwide Ins. Co.*, 281 Fed. Appx. 771, 777 (10th Cir. 2008) (affirming finding of non-superiority where defendant "would have to engage in a significant amount of

No matter how slim the possibility of attaining, for example, statutory damages, that possibility is superior to releasing those claims for no or little compensation. See *Brown v. Wells Fargo & Co.*, No. 11-1362 (JRT/JJG), 2013 U.S. Dist. LEXIS 181262, at *16-*17 (D. Minn. Dec. 30, 2013) (concluding that superiority was not satisfied where individuals would be "entitled to between $100 and $1,000 dollars in statutory damages" in successful individual litigation, but

---

work simply to identify the purported class members."); *Smith v. Georgia Energy USA, LLC*, 2014 U.S. Dist. LEXIS 166367, at *7 (S.D. Ga. Dec. 1, 2014) (decertifying class where defendants' financial insolvency made clear no benefit could inure to class members); *Ballard v. Branch Banking & Trust Co.*, 284 F.R.D. 9, 15-16 (D.D.C. 2012) (denying certification where identification and notification of individual consumer ATM users was impracticable). The Ninth Circuit reached a similar conclusion in *In re Hotel Tel. Charges*, 500 F.2d 86 (9th Cir. 1974). There, the court reasoned that "[w]henever, if not the only, beneficiaries to the class action are…not the individual class members, a costly and time-consuming class action is hardly the superior method for resolving the dispute," and that, "[w]hen, as here, there is no realistic possibility that the class members will in fact receive compensation, then monolithic class actions raising mind boggling manageability problems should be rejected." Id. at 91-92. In this case, the proposed settlements fall into that category. They provide at most an indirect and attenuated benefit to the class, justified on the grounds that individual distributions would be too costly because of the size of the class. Due to the impracticality of class member redress, these claims should proceed as individual actions if at all. Under state consumer protection laws, certain class members can seek statutory damages of up to $2,000. Ryan P. O'Quinn & Thomas Watterson, Fair is Fair: Reshaping Alaska's Unfair Trade Practices and Consumer Protection Act, 28 ALASKA L. REV. 295, 305-06 (2011) ("Twenty states set a minimum damages award for successful plaintiffs to encourage litigation of harms normally too insignificant to litigate. The minimum damages award varies from as low as $25 to as high as $2000, and the plaintiff is awarded the higher of the actual or statutory damages.").

Page 19

only $55 as a class member); *Sonmore v. CheckRite Recovery Servs.*, 206 F.R.D.

257, 265-66 (D. Minn. 2001) (holding that the discrepancy between the $25 that

class members could recover and the $1000 in statutory damages they could

recover individually meant that a class action was not superior); cf. also *Wilcox v.*

*Commerce Bank of Kansas City*, 474 F.2d 336 (10th Cir. 1973) (affirming finding

of non-superiority where individual statutory damages claims were available;

overruling the objection that the district court had failed to consider the

nonexhaustive factors listed in (b)(3)(A)-(D).

### B.  The S.A. Purports to Violate the First and Fifth Amendments

#### 1.      *Cy Pres* reversion to a third party, political advocacy group, is not appropriate

##### a.  What is *cy pres*?

The term *cy pres* is derived from a French phrase meaning "as near as."  In

the class action context, the reason for appealing to *cy pres* is to prevent the

defendant from walking away from the litigation scot-free because of the

infeasibility of distributing the proceeds of the settlement to the class.  *Hughes v.*

*Kore of Indiana Enter., Inc.*, 731 F.3d 672, 676 (7th Cir. 2013); *Mirfasihi v. Fleet*

*Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) ["'[C]y pres' is the name of a

doctrine of trust law that allows the funds in a charitable trust, if they can no longer

Page 20

be devoted to the purpose for which the trust was created, to be diverted to a related purpose; and, so, when the polio vaccine was developed the March of Dimes Foundation was permitted to redirect its resources from combating polio to combating other childhood diseases."]

When class actions are settled or tried, there are times that it's not possible to distribute all of the money recovered to some or all of the class members. They may be difficult to identify or find or it may not be economically feasible to distribute the funds to them. For example, the cost of distributing 50 cents to each of 6 million class members may preclude individual distribution, even though the defendant has been held accountable for cheating the class out of $3 million. When that is so, the *cy pres* doctrine allows the funds to be distributed to a nonprofit charitable organization to support work that indirectly benefits the class and advances the public interest.

### b. What kinds of *cy pres* distributions are appropriate?

Where it is not possible to directly distribute all of the money to the class members, a *cy pres* distribution to a non-profit organization may be appropriate.[10]

---

[10] "The fairness of the settlement must be evaluated primarily based on how it compensates class members." *Pampers*, 724 F.3d at 720 (emphasis in original). Although this Court cannot compel the settling parties to employ a direct payment process, it can and should refuse to approve a settlement until the parties do so of their own accord. Another viable option for the parties is limiting the release to those class members who submit claims forms. See *Fraser v. Asus Computer Int'l*,

The alternative, in some cases, is that parties may enter into settlements that allow all of the unclaimed money to go back to the defendant. This has the effects of enormously reducing the benefit the settlement confers on the class and letting the defendant keep the benefit of much (and sometimes nearly all) of the money it wrongfully took from the class. Courts generally have approved *cy pres* distributions in two circumstances. Am. Law Inst. ("ALI"), Principles of Law of Aggregate Litig. § 3.07, comment a (2010) ["First, many courts allow a settlement that directs funds to a third party when funds are left over after all individual claims have been satisfied.... Second, some courts allow a settlement to require a payment only to a third party, that is, to provide no recovery at all directly to class members."] See, *e.g.*, *In re Lupron Marketing and Sales Prac. Litig.*, 677 F.3d 21, 25 (1st Cir. 2012) (involving settlement that allowed consumers to claim 30% of their total out-of-pocket payments or $100, whichever sum was greater).

Courts generally require that, if feasible, "unclaimed funds" should be distributed to class members first rather than to a third party. See *In re Bank of Am. Corp. Sec. Litig.*, 775 F.3d at 1064 (holding unclaimed funds should be distributed to the class "except where an additional distribution would provide a windfall to class members with liquidated damages claim that were 100 percent satisfied by the initial distribution"); *In re Lupron*, 677 F.3d at 32 (noting the ALI

No. C 12-00652 WHA, 2012 U.S. Dist. LEXIS 181315, at *7-*10 (N.D. Cal. Dec. 21, 2012) (release should be limited to those who submit claim forms), revised settlement granted preliminary approval at 2013 U.S. Dist. LEXIS 22338 (N.D. Cal. Feb. 19, 2013); *Ross v. Trex Co.*, No. C 09-00670 JSW, 2013 U.S. Dist. LEXIS 74720, at *5 (N.D. Cal. May 28, 2013) (same as Fraser).

principles' policy that unclaimed funds be redistributed to ensure class members recover their full losses); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013) (cautioning that direct distributions to the class are preferred to *cy pres* distributions but holding that a district court does not abuse its discretion by approving a class action settlement agreement that includes a *cy pres* component); *Klier v. Elf Atochem North Am. Inc.*, 658 F.3d 468, 478–79 (5th Cir. 2011) (holding that district court abused its discretion by not redistributing funds left unclaimed by one segment of the class to another segment of the class).

Because the concept of a *cy pres* distribution is, that it should be, "as near as" giving the money to the class members, *cy pres* distributions should relate to the purposes of the case.[11]

### c.  What kinds of *cy pres* distributions are inappropriate?

When possible, monies recovered in class actions should go directly to the class members themselves.  It is inappropriate for a settlement to pay out all or nearly all of the money in *cy pres* distributions when it is possible to distribute significant sums to the class members themselves.  It is also, not appropriate, for the settling parties to attempt to direct *cy pres* distributions to personal favorite

---

[11] For instance, in a case that challenges predatory lending practices that, result in many people losing their homes, for example, it might be appropriate for residual funds to be distributed to organizations that address housing problems.  In a class action involving overcharges for pharmaceutical products, however, it would make little sense to distribute funds to such organizations

charities (such as one's alma mater) or political advocacy organizations that have no relationship to the issues addressed by the underlying lawsuit.

**2. Since Consumers Union is nakedly political, this raises constitutional issues**

Making a political contribution is First Amendment protected, expressive and associational activity. *Buckley v. Valeo*, 424 U.S. 1, 21 (1976) (per curiam). Concomitantly, individuals have a right to refrain from making such a donation, a right to not be compelled to engage in expressive and associational activity. See, e.g., *Knox v. Service Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2288 (2012) (the government "may not…compel the endorsement of ideas it approves.").

"First Amendment values are at serious risk if the government can compel a particular citizen, or a discrete group of citizens, to pay special subsidies for speech on the side that it favors." *United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001); *Keller v. State Bar of California*, 496 U.S. 1 (1990) (attorney bar dues cannot be used for political or ideological purposes); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235 (1977) (teacher union dues cannot be used for ideological activities not "germane" to their bargaining representative duties); *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (recognizing the right of an individual to reject a state measure that forces him "as a part of his daily life…to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable.").

In articulating this right, the Supreme Court has acknowledged Thomas Jefferson's view that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves[] is sinful and tyrannical." *Abood*, 431 U.S. at 234 n. 31, (quoting I. Brant, James Madison: The Nationalist 354 (1948)) (internal quotation marks omitted). *Abood* allowed room for charging dues for uses related to collective bargaining. *Id.* at 232. Recently, however, the Supreme Court cast doubt upon even this exception to the First Amendment right against compelled speech subsidy. *Harris v. Quinn*, 134 S. Ct. 2618, 2632 (2014) ("*Abood* failed to appreciate the conceptual difficulty of distinguishing in public-sector cases between union expenditures that are made for collective-bargaining purposes and those that are made to achieve political ends"). *Harris* refused to extend *Abood* to regulated occupations that were not "full-fledged public employees." *Id.* at 2638.

"[E]xcept perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support." *Id.* at 2644. These principles render class action, third-party awards (at least those awards like this one that will be reserved for lobbying, litigation, or other First Amendment political activity, whether termed "cy pres" or not) unconstitutional. Three premises support this conclusion.

The first premise is that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier v.*

Page 25

*Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) (citing ALI Principles of the Law of Aggregate Litigation § 3.07 cmt. (b)).

The second premise is that a third-party donation is an expression of support, association, and endorsement of the third-party's political agenda and activities. See, e.g., *Buckley, supra*; *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1294 (3d Cir. 1994) (Alito, J.) ("Joining organizations that participate in public debate, making contributions to them, and attending their meetings are activities that enjoy substantial First Amendment protection.").

And the third and final premise is that absent class members are being compelled into participating in the donations.

The S.A.'s "opt out" right is not an opportunity to merely abstain from the political donation, it is simply the right to exit the class action entirely. The settling parties are conditioning class members' right to participate in the action on their acceptance of the compelled donation, tantamount to telling union members or regulated professionals that their dues are not mandatory because they are always free to quit and find a new profession. This is a *Hobson's choice*, not a true opt-out. See *Keller*, 496 U.S. at 10 ("Claimants cannot be required by government action to relinquish First Amendment rights as a condition of retaining employment."); *Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 978 (1st

Cir. 1993), superseded on other grounds by Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998) (where the burden to avoid is "more than an inconvenience" a rule requiring monetary contribution should be viewed as compulsory).

The above discussion presumes that a noncoercive opt-out scheme would satisfy the First Amendment concerns, but recent jurisprudence has suggested that even an actual opt-out scheme may be too burdensome and that an opt-in scheme may be required by the First Amendment. *Knox v. SEIU*, 132 S. Ct. 2277, 2290-96 (2012). Because silence does not equate to consent, "[a]n opt-out system creates a risk that the fees paid by nonmembers will be used to further political and ideological ends with which they do not agree." *Id.* at 2290; see generally Christopher R. Leslie, The Significance of Silence: Collective Action Problems and Class Action Settlements, 59 FLA. L. REV. 71, 73 (2007) ("Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low.").

### III. <u>CONCLUSION</u>

Page 27

The Court should deny final approval to the S.A.  Free expression of ideas is what this country is about.  Ideas of all political stripes are welcome.  However, the class should not have to pay for either left wing or right wing social theorists in their embrace of political frivolity, "real" or "imagined" issues or anything else.  Class money cannot be misused in this fashion and the Court has a responsibility to prevent it.

Respectfully submitted,

Dated: November 27, 2015

Steven Franklyn Helfand
*In propria persona*
1400 SW 137th Avenue, Apt. F112
Hollywood, FL 33027
Telephone:  415.397.0007
Email:        sh4078@gmail.com

## AFFIRMATION BY STEVEN HELFAND

1. I am a class member having purchased and used the relevant Covered Products during the relevant class period.

2. Attached as **Exhibit A** is a true and correct copy of a variety of documents printed off the web concerning Consumer Reports. It also includes a copy of a blank claim form.

3. Pursuant to Section II of the claim form and the Notice, *generally*, I am a class member.

4. The objection procedure requests that I disclose "objections" I have made over the past five years. I am not sure what this means as in my practice I have had the pleasure of representing objectors to class action settlements. If the objections refer to those by me in an individual capacity, I gather I have filed a handful of them. I do not recall the cases. I believe one was a securities class action in Homestore in Federal Court. I have attached a relevant order at Exhibit A, pages 51-52. The Court noted, "Here, the Court finds that a substantial benefit was conferred on the class when Helfand raised serious questions about the timing of the class notice. As a direct of Helfand's objections, the Court ordered that the class be re-noticed, on a finding that a strong likelihood existed that a substantial portion of the class would not have received timely notice of the class action settlement. This was crucial to the ability of the class members' ability to recover money from the general fund, as many members likely received notice <u>after</u> the due date for submission of proof of claim. By bringing about re-notice of the class and extension of the due date, Helfand conferred a substantial benefit on the class."

5. Decisions of Note: *Rodriguez v. West Publ'g. Corp.* (9th Cir. 2009) 563 F.3d 948; and *Lane, et al. v. Facebook* (9th Cir. 2012) 709 F.3d 791; *Marek v. Lane, et al.* (2013) 134 S. Ct. 8 [Statement of Chief Justice Roberts respecting the denial of certiorari].

6. I have handled other cases and they are widely reported and therefore equally available by simply running my name on Westlaw or Lexis. Should there be any need for specific cases, the settling parties may meet and confer with me. Suffice it to say, over nearly fifteen years, I have handled approximately 20 to 30 objections on behalf of absent class members or myself.

7. I shall be appearing at the hearing to argue the objections. I respectfully request that the Court provide me with six to eight minutes of time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration is executed in Hollywood, Florida on November 30, 2015.

Steven F. Helfand

Ex. A



**mrc** NewsBusters

EXPOSING & COMBATING LIBERAL MEDIA BIAS

SEND A TIP | CONTACT | DONATE

Search... **Q**

MRC Business          MRC Culture          MRC Latino

HOT TOPICS: BEN CARSON | PARIS TERRORIST ATTACK | SYRIA

# Consumer Reports Tosses Political Neutrality Away With Pro ObamaCare Ad

By P.J. Gladnick | October 5, 2009 | 9:41 AM EDT   | **0** shares

So much for any claim of political neutrality on the part of Consumer Reports. They have now come out in support of ObamaCare which you can see on their website along with their TV ad. Here is the message from the president of Consumers Union, Jim Guest, publisher of Consumer Reports:

> Health care has been a top priority of Consumers Union since we started back in 1936. In the pages of Consumer Reports and the advocacy work we do for consumers, we've long argued for better health care that's more affordable and reliable.
>
> While working for better health care is not new for our organization, **today we are doing something that we've never done before. For the first time ever, Consumers Union is weighing in with a TV ad that calls on lawmakers to find a solution for health reform.**

You've also never engaged in partisan politics before. Say goodbye to your credibility, Consumer Reports:

You may wonder why we are injecting ourselves so publicly into a heated debate that has generated an enormous amount of concern and confusion. We believe that so much attention has been focused on the politics of health care that we're losing sight of the core problems. Health costs are skyrocketing, which affects all of us, and if you get seriously sick, having insurance is no guarantee that you'll get the care you need.

We are in the business of providing information and advice that helps consumers. We don't make campaign contributions. We don't endorse candidates. And we don't care who gets the credit for fixing the problems with health care—we just need them fixed. Doing nothing about health care is not a solution.

Too many Americans are just one pink slip away—or one major illness away—from losing their health coverage. That's why policymakers need to find a solution this year.

**You might not endorse candidates but you sure are endorsing a highly unpopular Democrat health care bill that will be costly to the taxpayers. Here is an excellent analysis from Le·gal In·sur·rec·tion about the decision by Consumer reports to toss away both its political neutrality along with its credibility:**

②

Consumer Reports has decided to weigh in on the health care debate in favor of the Democratic health care proposals, or what CR euphemistically calls "health care reform." Having decided to take sides, I think it is fair to hold CR to the standards it expects of the manufacturers and service providers reviewed monthly in its flagship magazine, and on its website.

Here is the mission statement of Consumers Union, the tax-exempt parent company of Consumer Reports (emphasis mine):

> Consumers Union (CU) is an expert, independent, nonprofit organization whose mission is to work for a fair, just, and safe marketplace for all consumers and to *empower consumers to protect themselves*. The organization was founded in 1936 when advertising first flooded the mass media. Consumers lacked a reliable source of information they could depend on to *help them distinguish hype from fact* and good products from bad ones. Since then CU has filled that vacuum with a broad range of consumer information....

Is the CR position, as laid out on its health care reform website, consistent with its mission statement? Does it provide information which empowers consumers can make a fully informed decision? And does CR present the negative as well as positive aspects of the pending health care proposals, so that consumers can distinguish hype from fact?

Unfortunately, the answer to each of these questions is that CR has not lived up to its own standards. The presentation on the CR health reform website is completely one-sided and presents only the best case scenario as to health care reform proposals on the table. As discussed below, CR's presentation is partisan, and potentially misleading, in numerous material respects. CR's presentation is what one would expect from an advocacy group with a political axe to grind, not the heretofore non-partisan name in consumer protection.

Le·gal In·sur·rec·tion has even more detailed analysis about the foolish nature of the decision by Consumer Reports to come out in support of ObamaCare. Read it as the requiem for the neutrality of Consumer Reports.



**P.J.** 🐦 Follow
**Gladnick**
**Bio | Archive**
P.J. Gladnick is a freelance
writer and creator of the
DUmmie FUnnies blog.

③

*a junkscience.com production*     **The Consumer Reports® Watchdog**

# Consumer Distorts

## Hot Topics - Trial Lawyers

SITE SEARCH

Search

TIPS

e-MAIL LIST

Submit

HOT TOPICS

Bioengineering
Breast Implants
Diet
Global Warming
Tobacco / Alcohol
Milk & Hormones
Pesticides
Pet Food
SUVs

Message Boards

Feedback

"Trial Ordered in Suit Over *Consumer Reports* SUV Rollover Testing" - The *Los Angeles Times* reports (Sep. 23), "In a setback to the nation's most popular consumer magazine, a federal judge ruled Wednesday that Consumer Reports' publisher must stand trial over Isuzu Motors Ltd.'s claim that the magazine rigged its vaunted vehicle-handling test in a deliberate campaign to destroy the reputation of the Isuzu Trooper sport-utility vehicle."

"Guardian of the Lawyers' Honey Pot" - Max Boot writes in the *Wall Street Journal* (Sep. 19, 1996), "What the public may not realize, though, is that CU uses its prestige to advance a host of controversial political positions that aren't exactly laboratory-tested. As a former staff member says, 'CU has always been unabashedly activist and liberal.' The group's Achilles' heel is that, like the rest of the "consumer movement," it often appears to be in a tacit and sometimes not-so-tacit alliance with trial lawyers."

Copyright © 1999 Consumerdistorts.com. All rights reserved or some such.

*a junkscience.com production*  **The Consumer Reports® Watchdog**

# Consumer Distorts

## About Consumer Distorts

SITE SEARCH

  Search

Submit

HOT TOPICS

Biotechnology
Breast Cancer
Diet
Global Warming
Food and Fabrics
Pesticides
PCBs
HRTs
Trial Lawyers

Message Boards
Feedback

Consumerdistorts.com is published by Steven Milloy, who also publishes Junkscience.com.

The purpose of Consumerdistorts.com is to spotlight the renewed emphasis on "junk science" at *Consumer Reports*. Generally speaking, junk science is faulty scientific data and analysis used to further a special agenda.

*Consumer Reports* uses junk science to develop "sensational" reports that advance the political agenda of its publisher, Consumers Union, and increase magazine sales.

Consumers Union is a lobbying group that advocates extreme environmental positions. Through *Consumer Reports,* Consumers Union uses "consumer" as a shield to deceive the public, media and policymakers about its ultimate political goals.

The historical high water mark for junk science at *Consumer Reports* was its participation in the groundless scare over the agricultural chemical Alar (circa 1989).

*Consumer Reports* now appears interested in bagging bigger game. Over the past year or so, *Consumer Reports* has stepped up its use of junk science in spearheading attacks on food biotechnology, plastics and pesticides.

Not surprisingly, Consumers Union's political advocacy is anti-consumer. It needlessly alarms consumers about the safety of consumer goods. This reduces consumer choice by scaring consumers away from products.

What have others said about *Consumer Reports*?

The Society of Toxicology says:

**"We believe that the [Consumers Union report's conclusions] concerning the dangers of pesticides in food are not credible and are unnecessrily alarmist."**

Source: Letter from the SOT to the U.S. Environmental Protection Agency, March 8, 1999

Science journalist Michael Fumento says:



**"When it comes to testing dishwashers, VCRs, and TVs, *Consumer Reports* has established a reputation for fairness and impartiality that has made it one of the most trusted consumer sources in the United States. Unfortunately, any month's issue that discusses a subject with an environmentalist angle should be renamed "Consumer Distorts."**

Source: "Scary baby bottle blather", Washington Times, May 16, 1999

Former *Consumer Reports* reporter Larry Katzenstein says:

**"...20/20 managed to overlook the real story: the transmogrification of [Consumers Union] over the past 10 years from an organization that helped to educate the public about what was truly risky and what wasn't...to a group determined to scare people about risks that in reality pose negligible or nonexistent dangers.**

Source: Letter from Larry Katzenstein to Brian Ross, investigative reporter for ABC's *20/20*, April 20, 1999

Media watchdog *Brill's Content* says:

**When it comes to deciding which products and services to buy, there's no more trusted source of information than this 63-year-old magazine. But the self proclaimed bastion of unbiased testing may not be as fair or conflict-free as it claims.**

Source: *Brill's Content*, "Testing *Consumer Reports*," September 1999

The American Council on Science and Health says:

**We at the American Council on Science and Health believe your editorial choices are unnecessarily alarmist. By focusing on hypothetical or negligible risks, like the phthalate and pesticide issues, *Consumer Reports* causes its readers to lose their health and safety perspectives.**

Source: Letter from the American Council on Science and Health to *Consumer Reports*, July 20, 1999

(6)

*a junkscience.com production*    **The Consumer Reports® Watchdog**



## Guardian of the Lawyers' Honey Pot

**By Max Boot**
**Copyright 1999 Wall Street Journal**
**September 19, 1996**

SITE SEARCH

 Search

tips

E-MAIL LIST

**Submit**

HOT TOPICS

Environmental
Health & Safety
Diet
Junk Science
For the Media
Reading List
Archive
Feedback

Message Boards
Feedback

YONKERS, N.Y. -- At the sprawling headquarters of Consumers Union, publisher of Consumer Reports, giant rollers knead mattresses to test their durability. Computers analyze stereo sounds in a mock living room, complete with wall panels to simulate curtains. Food tasters pick apart peanut butter and cookies while breathing specially filtered air.

"David Letterman wanted to come here," says R. David Pittle, CU's technical director, as he leads a visitor on a tour. "Our answer was no. We take this stuff very seriously, we don't want to make it into a joke." This is the image CU would like to project: an organization whose dedication to quality control and objectivity borders on the neurotic. It's a lucrative aura: Consumer Reports has 4.5 million subscribers and Consumers Union has a budget of $136 million, mostly financed by those subscriptions. The nonprofit organization supports 457 employees.

What the public may not realize, though, is that CU uses its prestige to advance a host of controversial political positions that aren't exactly laboratory-tested. As a former staff member says, "CU has always been unabashedly activist and liberal." The organization has raised alarms about Alar and bovine growth hormone, protested cuts in social spending, and lobbied for anti-redlining legislation in the insurance industry. But longtime president Rhoda Karpatkin appears to be oblivious to her group's bias. Asked about the organization's support for the kind of Canadian-style single-payer health plan rejected even by the Clinton administration, Ms. Karpatkin said, "I wouldn't call it Left. I'd call it common sense."

Although Consumers Union still has high public prestige, the organization's credibility has been challenged in recent years by auto makers and other manufacturers. The group's Achilles' heel is that, like the rest of the "consumer movement," it often appears to be in a tacit and sometimes not-so-tacit alliance with trial lawyers.

Consumer Reports, after all, is a virtual bulletin board of big-



Consumer Distorts: The Consumer Reports <r> Watchdog

money lawsuit ideas. The October issue, for example, will carry a report denouncing two sport utility vehicles -- the Isuzu Trooper and Acura SLX -- for allegedly being unstable in sharp turns. Two class action suits citing those findings, which were unveiled last month, already have been filed in Florida. Isuzu, which makes both vehicles, responded by taking out full-page newspaper ads and holding a press conference to denounce CU's tests as "unreliable and misleading." CU says its procedures are based on government standards, but Isuzu's Norihiko Oda argues that it is easy "for the driver to knowingly or unknowingly influence the outcome."

The Isuzu controversy is a virtual replay of a battle between Consumers Union and Suzuki that has been raging since July 1988. That month, Consumer Reports announced that it would publish an article rating the Suzuki Samurai, another sport utility vehicle, as "Not Acceptable" because the vehicle supposedly exhibited a dangerous tendency to roll over in tests. Suzuki general counsel George Ball says, "This caused a precipitous drop in sales and a precipitous increase in lawsuits."

Suzuki has settled many of the 194 suits filed so far, but it's won three out of the four cases that have been decided by juries. Like the preponderance of juries, federal regulators have doubts about Consumers Union's claims. The National Highway Traffic Safety Administration refused to recall the Samurai. In its ruling, NHTSA held that CU's "test procedures do not have a scientific basis and cannot be linked to real-world crash avoidance needs, or actual crash data." The data, NHTSA found, do "not show that the Samurai has been involved in a greater rate of rollovers than comparable vehicles." Similar conclusions were reached by government agencies from Britain to New Zealand. Suzuki now has filed a defamation suit in federal court in Orange County, Calif., against Consumers Union, claiming its tests are rigged.

Mr. Pittle, CU's technical director, defends his tests of the Samurai and says his organization has no ax to grind with Suzuki or any other company. But months before the CU report came out, the Center for Auto Safety had already asked for a recall of the Samurai. The center, co-founded by CU and Ralph Nader, is run by Clarence Ditlow, a long-time CU board member. While insisting that board members like Mr. Ditlow have no impact on CU's testing, Ms. Karpatkin says that "there was clearly contact at the time" between the two groups. Mr. Ditlow confirms that Consumer Reports often calls his center for "background information."

Those contacts are troubling because Mr. Ditlow has a rich



history of providing fodder for lawsuits. He popularized the story about "exploding" General Motors pickup trucks, which NBC subsequently had to retract. In 1993 Mr. Ditlow accused a GM lawyer of destroying evidence about the pickups; the lawyer sued for slander, and Mr. Ditlow's insurance company (over his protests) settled for $500,000. During that case, a Detroit judge fined Mr. Ditlow for "gross misconduct" for sharing a sealed document with a plaintiffs' lawyer suing GM. An appeals court overturned the fine, but determined that Mr. Ditlow's outfit and the plaintiffs' lawyer had "mutual back-scratching arrangements." Even more explicitly, on March 8, 1994, a California judge overseeing a class action against Nissan held that Mr. Ditlow's center had acted "in active concert with, and as agents of" two Texas trial lawyers (Mr. Ditlow's lawyer claims the order is somehow invalid).

No wonder Suzuki is irate. Large auto companies, however, are not the only businesses crosswise with Consumers Union. Frank Rumpeltin, president of Century Products in Macedonia, Ohio, remembers July 24, 1995, as Black Monday. That afternoon he received a fax saying that CU planned to hold a press conference in two days to denounce his best-selling infant car seat, the 590 model, as "Not Acceptable." In CU's tests the 590 flew off its base in a 30-mile-an-hour head-on collision. "I was shocked," Mr. Rumpeltin recalls. "We'd sold over two million units, and our record on injuries was incredibly good." No matter.

Within 24 hours of the CU press conference, a class action suit was filed in Illinois, citing the CU report. Within 48 hours another suit was filed in Tennessee. A third was filed within a week in Ohio. What's remarkable, however, is that none of the suits actually claim that a baby was injured because a car seat flew off its base. The plaintiffs are generally asking for the difference in cost between the 590 and another, less expensive car seat -- not for any personal injury damages. The plaintiffs' lawyers stand to make $5 million to $10 million, but Glen Berman, an attorney suing Century in Illinois, says, "I'm not aware of any cases where an infant was injured." If even the lawyers can't round up mangled plaintiffs, the car seat may not be so unsafe after all.

Indeed, both Century and the government tested the seat, and didn't find the problems reported by CU. As a result, NHTSA turned down CU's petition to recall the 590 and to change the standards for baby seats. "After carefully reviewing CU's petition," the Federal Register reported, "NHTSA has determined that safety is best served by denying it." Mr. Pittle says, "We stand by our tests."

Aside from providing lawsuit ideas, Consumers Union has



put its prestige behind political causes favored by the plaintiffs' bar. The group has opposed almost every measure to rein in the runaway legal system -- even the securities lawsuit reform passed by a two-thirds majority of Congress. In the past, the one issue on which CU diverged from the trial lawyers was no-fault auto insurance, which CU supported. But the organization opposed a comprehensive no-fault initiative on the California ballot this year, on the grounds that it would have foreclosed too many lawsuits. CU did file an ethics complaint with the California State Bar accusing the lawyers of misusing the organization's name in a mailing, but that was after the election, when it no longer mattered.

CU claims the current legal system is pro-consumer, and that tort reform would benefit "drunk drivers" and "careless corporations." Yet every American pays a heavy "tort tax" in the form of higher rates for insurance and many products, while RAND's Institute for Civil Justice found that plaintiffs get just 50 cents of every dollar paid out in personal injury litigation, and substantially less in major cases.

It's no surprise that CU doesn't highlight these facts, given its Naderite ties. In addition to Mr. Ditlow, CU's board includes Joan Claybrook, president of Public Citizen, which sells litigation kits to lawyers suing over breast implants, pedicle screws and other products. (To its credit, Public Citizen, like the Center for Auto Safety, does sometimes challenge lawyers' fees in class actions.) Another link between Consumers Union and the plaintiffs' bar: CU's legislative director, Linda Lipsen, moved over to work for the Association of Trial Lawyers of America. But while CU is a key ally of the lawyers, its employees are not always eager to publicize that connection. Trudy Lieberman, Consumer Reports' senior investigative editor, wrote a lengthy article for the Columbia Journalism Review attacking this page for assorted "errors," many in articles relating to tort reform, without ever mentioning her employer's position on the issue.

Consumers Union's opposition to tort reform is especially suspect because the organization seems to have developed a direct financial stake in the litigation explosion. Its West Coast office has received money from class-action suits at the direction of plaintiffs' lawyers.

Two of CU's biggest benefactors have been attorneys James and Patricia Sturdevant of San Francisco. The Sturdevants (who are now divorced) developed a lucrative practice suing financial institutions under an obscure California law that prohibits many late fees for credit cards. These class actions often net millions for the Sturdevants, but the actual class members are eligible for only a few dollars apiece in

compensation, so a lot of the money goes unclaimed. Under a legal doctrine known as cy pres, the Sturdevants have gotten judges to award the unclaimed proceeds to so-called consumer groups. In 1984, the Sturdevants convinced a judge to give CU $1.5 million from a settlement with Avco Financial. In 1993, the Sturdevants helped redistribute $703,060 from Wells Fargo to CU. Judith Bell, co-director of CU's West Coast office, says that in the past 20% of her budget has come from such awards; the figure is now down to 9%, she adds.

Consumers Union's president, Ms. Karpatkin, herself a lawyer, claims the cy pres loot doesn't compromise her group's independence because it's awarded by the courts. Technically true, but in fact the money is given at the express recommendation of the plaintiffs' lawyers. In the Wells Fargo case, CU and other cy pres recipients even had to report to the Sturdevants twice a year to get their disbursements. California Assemblyman Bernie Richter sponsored a bill two years ago to redirect cy pres money to a state scholarship fund. The measure went nowhere after active lobbying by CU.

"Consumers Union and the whole consumer movement have a real credibility problem on the tort reform issue because of their relationship with the trial lawyers," says California consumer advocate (and tort reformer) Bill Zimmerman. For serving up a smorgasbord of litigation ideas, protecting the lawyers' honey pot and feasting from the class action trough, Consumers Union's approach to the legal system deserves a rating of "Not Acceptable."

*Mr. Boot is deputy features editor of the Journal editorial page.*

Copyright © 1999 Consumerdistorts.com. All rights reserved on original works

 **PPLESEED**



Our History

Justice For All: Appleseed at 20



In 1993, Richard J. Medalie, a successful Washington lawyer, wrote to his fellow Harvard Law School classmates to solicit their involvement in "an exciting development" that had occurred during their 35th Reunion. "Members of our Class," he reported, "voted to establish a Class of 1958 sponsored and funded foundation to help organize, establish, and guide state centers for law in the public interest throughout the country."



Thus was launched an entity stemming from discussions that had been germinating for several years amongst Medalie and a group of fellow Harvard-trained lawyers who sought a new approach to pro bono legal organizations. Their strategy was to focus on broad systemic social initiatives, rather than the traditional model of providing legal services to individuals.

"I don't think any of us in that original group – in our wildest optimism – could have anticipated Appleseed would have developed this way. It was a group of friends who had an idea of how to utilize the talents of accomplished lawyers for the public good. So we started slowly, and a lot of people put an enormous amount of effort into it and found they got tremendous satisfaction in watching the seeds blossom," said founding member Arthur R. Miller, who is currently a University Professor at New York University School of Law. Although litigation was certainly a weapon in the arsenal, policy analysis, research, legislation, and rule-making were better suited to the organization's mission. The central theme that united the first Appleseed generation was the notion that law is not just something to restrain abuses, but rather is an opportunity to give people the chance to fulfill their potential in life.

"We have called the entity formed to carry on this program Appleseed," Medalie's letter announced, "because our concept is to plant a seed from which a public service activity involving lawyers, young and old, can grow and develop across the country."

appleseed@appleseednetwork.org



ADVANCED SEARCH<sup>PRO</sup>   MEDIA LISTS<sup>PRO</sup>   ALERTS<sup>PRO</sup>   WHO SHARED?   EXTRAS ▾

# Micah Sifry  ✓ VERIFIED

📍 Home

✎ Editor at Director, TechPresident.com

✉ Politics, Technology, U.S.

**As seen in:** Salon, Mother Jones, The Nation

✉ Is this you? Contact us to edit this page

BIO / VIEW      ARTICLES

## ABOUT

Discontent creator, Co-founder, Personal Democracy Media and http://CivicHall.org

## ARTICLES

SEE ALL 90 ARTICLES

Connections | Civicist



By Micah Sifry

civichall.org — A social graph of NH voters! Walmart is paying people to spy on OUR Walmart, and more. Brave new world. Sasha Issenberg reports for Bloomberg Politics on the work of data-mining start-up Applecart, which has built a "social graph" of the voters of New Hampshire in an attempt to figure out not just who is connected to who socially, but who has the greatest influence on who.

A DAY AGO   🐦   f   in                    Micah Sifry

**Micah Sifry** Editor at Director, TechPresident.com                    a day ago

First Post: Connections, is up civichall.org/civicist/conne... #socialgraph #ourwalmart

👍   🔁   💬

Fixes | Civicist



By Micah Sifry

civichall.org — The need for deep, sustained coverage of the super-rich, the seduction of always-on ambient surveillance, and more. Today's civic-tech must-read: Joshua Tauberer, a 15-year veteran of open government platform-making (he runs GovTrack.us), has posted a well-reasoned rant explaining why people trying to fix democracy with new tech tools or platforms are almost universally going to fail.

2 DAYS AGO   🐦   f   in                    Micah Sifry

**Micah Sifry** Editor at Director, TechPresident.com                    2 days ago

First Post: Fixes, is up civichall.org/civicist/fixes/ #opengov #civictech #onepercent

👍   🔁   💬

Cute Cats to the Rescue

### Contact Micah

✉   Email Micah by joining Muck Rack

🐦   TWITTER

f   FACEBOOK

in   LINKEDIN

    KLOUT

📷   FLICKR

    GOOGLE+

    YOUTUBE

    FOURSQUARE

    QUORA

    WEBSITE

### Are You a Journalist?



Create a free Muck Rack account to customize your profile and upload a portfolio of your best work.

Plans & Pricing

⑭

11-26-2015                                          Micah Sifry - Journalist on Muck Rack



By Micah Sifry

civichall.org — Gov't: friend or foe?, the open data revolution, or lack thereof, and more. Governing attitudes. The Pew Research Center is out with a new report on Americans' attitudes toward government. While many of the findings are familiar-only one in five trust the government always or most of the time-some are startling.

7 DAYS AGO    🐦  f  in                                    Web link here →

**Micah Sifry** Editorial Director, TechPresident.com                3 days ago
First Post: Cute Cats to the Rescue, is up civichall.org/civicist/cute-.  #pewresearch #BrusselsLockdown #opendata (cc @ethanz)

---

First Post: Never Again



By Micah Sifry

civichall.org — We repeat, civic tech cannot be neutral, 'med dogs', compassionate crowdfunding, and more. Editorial comment: While the focus of Civicist and this First Post morning round-up is on civic tech-the use of technology for public good-we believe it is also important to pay attention to larger trends as well.

6 DAYS AGO    🐦  f  in                                    Web link here →

**Micah Sifry** Editorial Director, TechPresident.com                6 days ago
First Post: Never Again, is up civichall.org/civicist/never-.  #refugeeswelcome #SyrianRefugees #Trump2016 #carson2016 #facebooknewsfeed

**Micah Sifry** Editorial Director, TechPresident.com                6 days ago
@KatiSipp Thanks! It's online now, civichall.org/civicist/never-. Members of civichall, get it early by email.

---

First Post: Capacities



By Micah Sifry

civichall.org — Snapchat voters; mapping civic hackers on Github; and more. Anonymous is claiming to have disabled more than 6,000 Twitter accounts tied to ISIS. Elizabeth Weise reports for USA Today. According to McGill University's Gabriella Coleman, an expert on Anonymous, Weise cites, the people participating "include French hackers, military geeks, Syrians who are being harmed by IS, some Tunisians and some Palestinian hackers who live overseas."

7 DAYS AGO    🐦  f  in                                    Web link here →

**Micah Sifry** Editorial Director, TechPresident.com                7 days ago
RT @Civicist: Snapchat voters; mapping civic hackers on Github; and more in @Mish's 1st Post civichall.org/civicist/capac-.

---

Invocations | Civicist



By Micah Sifry

civichall.org — Tech titans react to terrorism in Paris; how to join the civic tech movement, and more. Tech vs. terror: BuzzFeed's Brendan Klinkenberg reports on how several leading tech platforms, including Facebook, Google, Airbnb, Uber, and Twitter responded to the terror attacks in Paris.

11 DAYS AGO    🐦  f  in                                    Web link here →

**Micah Sifry** Editorial Director, TechPresident.com                11 days ago
First Post: Invocations, is up civichall.org/civicist/invoc-.  #ParisAttacks #Facebook #SafetyCheck #sharingeconomy



## Enterprising | Civicist



By Micah Sifry

civichall.org — BlackonCampus: why think tanks should become civic
enterprises, trusting in the cloud, and more. Today's must-reads: New
America president (and Civic Hall founding partner) Anne-Marie
Slaughter and Open Technology Institute senior adviser Ben Scott say
it's time for think tanks to become "civic enterprises."

13 DAYS AGO  🐦  f  in

**Micah Sifry** Editorial Director, TechPresident.com
First Post: Enterprising, is up civichall.org/civicist/enter... #newamerica #microsoft
#opengov #18F #BlackOnCampus

## Impacts | Civicist



By Micah Sifry

civichall.org — How Americans think tech has impacted politics; how
USDS and 18F are changing tech & gov't; and more. Yahoo is holding a
conference on tech and politics today at Drake University in Des
Moines, starting at 9:30am Central Time, livestreamed here. Sen. Rand
Paul is the one presidential candidate on the agenda.

13 DAYS AGO  🐦  f  in

**Sarah Lai Stirland** Senior Staff Writer, TechPresident.com
RT @Misf: First Post: Impacts, is up civichall.org/civicist/impac... #techpolitics
#USDS #18F #socialgov #govtech #Yaleprotest

**Micah Sifry** Editorial Director, TechPresident.com
First Post: Impacts, is up civichall.org/civicist/impac... #techpolitics #USDS #18F
#socialgov #govtech #Yaleprotest

## First Post: Crushing It



By Micah Sifry

civichall.org — Bush would redo internet regulation; calling for an
Independent Order of Oddfellows; and more. Tech and the
presidentials. Tech policy hasn't really surfaced yet as an issue in the
presidential campaign, but during last night's Republican debate, rising
contender Marco Rubio did say this: "It took the telephone 75 years to
reach 100 million users.

15 DAYS AGO  🐦  f  in

**Micah Sifry** Editorial Director, TechPresident.com
First Post: Crushing It, is up civichall.org/civicist/crush... #Rubio2016 #Jeb2016
#GOPDebate #civictech #futureofwork #opengov

## Pulses | Civicist



By Micah Sifry

civichall.org — The US agency that spent 10 years & a billion dollars on
one online form. Facebook on the GOP, and more. Why can't we be
friends? President Obama just launched his own Facebook page,
because, apparently, the Barack Obama Facebook page isn't his, it just
belongs to a politician with the same name and 45 million followers.

(16)

Micah Sifry - Journalist on Muck Rack

**Micah Sifry** Editorial Director, TechPresident.com                    16 days ago

First Post: Pulses, is up civichall.org/civicist/pulse    #facebook #18F #futureofwork.
#polls

More Articles →

## TWITTER FEED                                   @MLSIF — **14,076** FOLLOWERS **15,684** TWEETS

**Micah Sifry** Editorial Director, TechPresident.com                    about 8 hours ago

RT @nytpolitics: "So sad," Trump said of two protesters at a rally "Yeah, you can
get 'em the hell out" nyti.ms/21h60UI pic.twitter.com/r9bDY4nJWS

**Micah Sifry** Editorial Director, TechPresident.com                    about 9 hours ago

RT @stephaniefrom: America Is Too Dumb for TV News rol.st/1SkCWFQ via
rollingstone

**Micah Sifry** Editorial Director, TechPresident.com                    a day ago

First Post: Connections, is up civichall.org/civicist/conne...  #socialgraph
#ourwalmart

**Micah Sifry** Editorial Director, TechPresident.com                    a day ago

@nStaughter, rAM @pmarca Curious minds want to know, what are you saying, Marc?

**Micah Sifry** Editorial Director, TechPresident.com                    2 days ago

RT @JoeGerstson: Seen @JohnKasich's new ad? it draws a straight line from
@realDonaldTrump to [GODWIN'S LAW VIOLATION] youtube.com/watch?
v=qCQH8Y

**Micah Sifry** Editorial Director, TechPresident.com                    2 days ago

RT @Sassy88_8: Beep

**Micah Sifry** Editorial Director, TechPresident.com                    2 days ago

First Post: Fixes, is up civichall.org/civicist/fixes/ #opengov #civictech #onepercent

**Micah Sifry** Editorial Director, TechPresident.com                    3 days ago

First Post: Cute Cats to the Rescue, is up civichall.org/civicist/cute-... #pewresearch
#BrusselsLockdown #opendata (cc @ethanz)

**Micah Sifry** Editorial Director, TechPresident.com                    3 days ago

"Inactive User" is supporting me on Brigade! pic.twitter.com/x6No5flgjt

**Micah Sifry** Editorial Director, TechPresident.com                    4 days ago

@rachelmmyers aww shucks! I miss you too!

LOAD MORE STATUSES

(13)

# micah.sifry.com

- Home

## Why I'm holding my nose and voting for Cuomo on the WFP line (and hope you will too)

November 2nd, 2014 Posted in Uncategorized
Nov, 02 2014
No Comments »

Dear friends:

If you are like me, you face a strange dilemma this Tuesday.

You know our awful governor Andrew Cuomo is a manipulative, lying control freak, who shut down an investigation into corruption in Albany before it could finish its job (and prevented it from looking into anything touching his own administration), and, as The New York Times recently reported, who previously botched and then covered up his own mishandling of the Hurricane Sandy crisis. He's nothing like his father, having recently declared that liberals are against any raising of taxes on the rich because that would be "confiscation." I could go on...

But I'm going to hold my nose and vote for him on the Working Families Party line*, not because I in any way support him, but because I want the WFP to keep its ballot line—which is the source of much of its power. And we need at least 50,000 votes to do so. So your vote matters.

Some of you may be attracted to voting for Cuomo on the new "Women's Equality Party" that Governor Cuomo started this summer. Please don't. It's a sham. It's not a coincidence that the new party's initials "WEP" and just one letter off from the WFP. Cuomo created this thing to try to siphon votes away from the WFP. Here's a photo that shows what he really thinks of "women's equality."

He hates the Working Families Party with a passion because it is the only institution in NY that has challenged him and had the power to extract concessions from him that address progressive concerns. (For example—the WFP got Cuomo to promise to campaign for a Democratic-controlled state Senate. Imagine that, a Democratic governor who had to be forced to make that promise.)

I'm sure some of you are thinking, didn't the WFP get played by Cuomo last May, when it decided to endorse him rather than run its own candidate, namely Zephyr Teachout, on its line? I think you are right, the party's state committee made a strategic mistake. Though, in fairness, they could not have known how terrific Zephyr would be on the campaign trail.

Unfortunately, Zephyr isn't on the ballot this Tuesday, or I'd certainly be voting for her (and her running mate Tim Wu). So what to do?

Some of you may be considering voting for Howie Hawkins, who is running (again) for governor on the Green Party line. I can understand that choice—the Greens, on paper, represent a real alternative politics. But ask yourself—what has the Green Party of NY actually done between elections?

Since its founding in 1998, the WFP has won increases in the state minimum wage, the passage and extension of a "millionaire's tax," reform of the Rockefeller drug laws, paid sick days, an end to the abuse of stop and frisk, even living wage legislation in Westchester and an affordable housing ordinance in Yonkers. It's also been central to the election of a progressive majority on the New York City council. And it's been an active, vital home for the often-siloed progressive organizations of this state to come together and pool their energies. It's not perfect, but it's an institution that many of us have fought to build and one we can't afford to lose. We can work on fixing it after Election Day.

So, hold your nose, vote for the bastard on the WFP's line. It matters.

*For those of you who may need a refresher on the WFP and how third-party ballot lines work in NY, here you go:

In NY, the old system of "fusion" or "cross-endorsement" was never outlawed. That is, until the late 1800s across America, parties could "fuse" around a common candidate, have their votes tallied separately on each line, but the candidate would get the total. That system actually enabled a robust multi-party system (in fact, it's partly how the US's one successful third party, the Republicans, made it out of minor party status). And in the late 1890s, the two major parties started outlawing it, in order to stamp out the rising Populist Party. But in NY the system was never outlawed, allowing us to have a number of smaller parties going back decades, like the Conservatives, the Liberals, Right to Life, etc.

In 1998, a bunch of labor unions, ACORN and Citizen Action, plus some progressive politicians, got together and created a new party, Working Families, and managed to get 50,000 votes (the threshold required by state law) for Peter Vallone (a hack who was also the Democratic nominee against George Pataki) on their new line. Having done that, they then got the benefit of having an official line on the ballot (i.e. not having to petition for each candidate they might endorse) and have used that quite effectively over the years to leverage progressive power.

The WFP was actually the most successful offspring of an earlier effort called The New Party which tried to revive the practice of fusion all at once by seeking a Supreme Court ruling overturning fusion bans as violations of the First Amendment right of association. The New Party lost that case (shockingly, the Supremes found the protection of the existing two-party system to be enshrined by the Constitution even though political parties are mentioned nowhere in that document), but since the rise of the WFP in NY the idea has taken hold and there are now WFP efforts in several other states as well—but none as advanced as in NY.

Way more details to be found in my book "Spoiling for a Fight: Third-Party Politics in America."

🔁 Share / Save 🔘 🔵 🔁 ≑

Read More

# Remembering Jetta

June 19th, 2014 Posted in Uncategorized
Jun, 19 2014
13 Comments »



from The Center for Investigative Reporting
(https://www.revealnews.org/)



SHARE

# The Secret History of American Surveillance

*Topics: Criminal Justice (https://www.revealnews.org/topic/criminal-justice/) / Cybersecurity (https://www.revealnews.org/topic/cybersecurity/) / National Security (https://www.revealnews.org/topic/national-security/) / Surveillance and Privacy (https://www.revealnews.org/topic/surveillance-privacy/)*

*By Ariane Wu (https://www.revealnews.org/author/ariane-wu) / October 15, 2015*

The Secret History of American Surveillance





Produced by Ariane Wu | Credits (http://www.revealnews.org/article/the-secret-history-of-american-surveillance/#credits)

From cellphone
(https://www.washingtonpost.com/apps/g/page/world/how-the-nsa-is-tracking-people-right-now/634/) spying to facial
(http://cironline.org/reports/facial-recognition-once-battlefield-tool-lands-san-diego-county-5502) scanning technology to massive data farms
(http://www.wired.com/2012/03/ff_nsadatacenter/all/1), it's no secret that the U.S. government is gathering loads of personal information on its citizens.

But few remember the origins of our modern surveillance state. Some argue that it was forged over 115 years ago, half a world away in the Philippine Islands.

The story begins in the mid-1870s, when a technological renaissance catapulted America into its first information revolution. Thomas Edison's quadruplex telegraph and Philo Remington's typewriter allowed data to be recorded accurately and transmitted quickly. Inventions such as the electrical tabulating machine and the Dewey Decimal System could count, catalog and retrieve huge amounts of information efficiently. Photography was becoming widely accessible, thanks to George Eastman's roll film, and biometric criminal identification systems such as fingerprinting were adopted from Europe. Our ability to manage, store and transmit data grew by leaps and bounds.

21



When the U.S. occupied the Philippines in 1898, these inventions became the building blocks for a full-scale surveillance state that was used to suppress Filipino resistance.

According to historian Alfred McCoy, who has written (https://muse.jhu.edu/books/9780299234133) extensively on this topic, Capt. Ralph Van Deman – dubbed "the father of U.S. military intelligence" – masterminded a security apparatus that compiled "phenomenally detailed information on thousands of Filipino leaders, including their physical appearance, personal finances, landed property, political loyalties, and kinship networks." The system ended up indexing 70 percent of Manila's entire population.

This total information control coupled with laws such as the Sedition Act, which severely punished anyone who engaged in "subversive" political activity, allowed the governor-general of the islands, William Howard Taft, to manipulate and blackmail anyone at will.

22



Years later, the colonial policing used in the Philippines was refined and adapted to be used domestically in the U.S. The first example, McCoy notes, was shortly after America entered World War I.



At the time, rapidly growing labor strikes and radical groups were fueling a public hysteria of immigrants and leftists. This was the first Red Scare. The 1917 Espionage Act and 1918 Sedition Act punished political "subversion." Postmaster General Alfred S. Burleson banned virtually the entire anti-war and socialist press. Van Deman's military intelligence division collaborated with groups such as the American Protective League to collect more than a million pages of surveillance reports on German Americans in 14 months. By 1920, Attorney General A. Mitchell Palmer and a young J. Edgar Hoover had arrested more than 10,000 people in mass raids around the country. Scandal erupted when the public learned that most of the arrested were not foreign immigrants, but U.S. citizens. In the end, public outrage forced Uncle Sam to curb domestic surveillance, and the State Department's cryptography unit was abolished.



Many have pointed out the cyclical nature of American domestic surveillance. First, a real or imagined crisis such as communism or terrorism gets perceived as a threat to national security. To combat these dangers, U.S. leaders develop new surveillance technologies, clandestinely using it on innocent civilians. Often, the government's first targets and scapegoats are

society's most marginalized groups. FBI Director Hoover's COINTELPRO, for instance, infiltrated the Black Panthers, American Indian Movement and anti-Vietnam War organizations by using illegal wiretapping, mail opening and undercover informants. When these invasive spy operations are exposed, as they were after the Palmer Raids and Watergate scandal, laws are passed to prevent future trampling of citizens' rights.



The scapegoats and government agencies doing the spying may change over time, but in the U.S., the pattern of domestic surveillance has generally been the same. That is, until recently.

Mass surveillance today is far less expensive and labor intensive than it used to be. The rate at which technology is growing also has completely outstripped current laws that regulate use of such technologies. It's problematic because so much of this surveillance is opaque. Take, for instance, government aerial surveillance. After the death of Freddie Gray in Baltimore, some people noticed small, low-flying planes circling above protesters. Later, the Associated Press reported (http://www.businessinsider.com/the-fbi-is-reportedly-operating-a-small-(25)

air-force-to-monitor-americans-2015-6) that the surveillance equipment on these sorts of planes were used "without a judge's approval" and that fictitious companies were used as fronts by the FBI to fly these planes.



Details about the use of cellphone-spying technology, often generically called "stingrays," also are shrouded in secrecy (http://www.theguardian.com/us-news/2015/sep/04/baltimore-cases-overturned-police-secret-stingray-surveillance). Stingrays are capable of scanning all cellphones in the area in which they are being used, not just target phones. Harris Corp., which manufactures this technology, requires law enforcement agencies that use stingrays to sign legal agreements preventing them from saying anything about it (http://www.nytimes.com/2015/03/16/business/a-police-gadget-tracks-phones-shhh-its-secret.html), even in court. Some states, the most recent one being California (http://arstechnica.com/tech-policy/2015/10/california-governor-signs-new-law-mandating-warrant-for-stingray-use/), are taking action, requiring police to get warrants if they want to use stingrays in investigations.

26

Government surveillance increasingly depends on private companies to handle sensitive information, which is a worrisome trend. Companies such as Amazon Web Services (http://fortune.com/2015/06/29/intelligence-community-loves-its-new-amazon-cloud/) provide cloud computing infrastructure for intelligence-related government agencies. Palantir Technologies Inc. (https://www.palantir.com/) analyzes mountains of data, helping agencies including the CIA, National Security Agency, FBI (http://techcrunch.com/2015/01/11/leaked-palantir-doc-reveals-uses-specific-functions-and-key-clients/) and local governments identify suspicious trends and connect the dots among known criminals.

It's good to keep in mind that companies such as Google and Facebook ultimately serve their bottom line and not the public. In short, private companies may be essential to helping Uncle Sam collect data, but how beholden to them do we want government to become?



**SIGN UP FOR OUR NEWSLETTER**

27



# Financials

## CONSOLIDATED BALANCE SHEETS

May 31, 2015 and 2014

## ASSETS

CURRENT ASSETS:

Cash and cash equivalents
**2015**
25,115,000
**2014**
23,870,000

Investments
**2015**
300,675,000
**2014**
293,633,000

Trade receivables, net
**2015**
6,055,000
**2014**
5,789,000

Inventories

**2015**

1,504,000

**2014**

2,206,000

Auto test inventory

**2015**

2,014,000

**2014**

2,145,000

Grants and other receivables

**2015**

2,845,000

**2014**

2 ,431,000

Deferred promotion cost

**2015**

16,114,000

**2014**

15,831,000

Prepaid expenses and other current assets

**2015**

8,822,000

**2014**

8,211,000

---

**Total current assets**
**2015**
**363,144,000**
**2014**
**354,116,000**

Property and equipment, net
**2015**
57,607,000
**2014**
57,651,000

Deferred promotion cost – long term
**2015**
2,152,000
**2014**
1,925,000

Other assets
**2015**
3,291,000
**2014**
3,714,000

Grants receivable – long term
**2015**
1,724,000
**2014**
2,736,000

---

**Total assets**
**2015**
**427,918,000**
**2014**
**420,142,000**

# LIABILITIES AND NET ASSETS

CURRENT LIABILITIES:



Accounts payable and accrued liabilities

**2015**

14,076,000

**2014**

12,001,000

Accrued compensation

**2015**

9,792,000

**2014**

9,910,000

Unearned subscription revenue

**2015**

110,413,000

**2014**

116,728,000

Current portion of long-term debt

**2015**

1,300,000

**2014**

1,250,000

---

**Total current liabilities**
**2015**
**135,581,000**
**2014**
**139,889,000**

Unearned subscription revenue – long term

**2015**

35,166,000

**2014**

33,742,000

Liability under derivative instrument

**2015**

6,691,000

**2014**

5,718,000

Long-term debt

**2015**

41,250,000

**2014**

42,550,000

Other liabilities

**2015**

38,946,000

**2014**

31,382,000

**Total liabilities**

**2015**

**257,634,000**

**2014**

**253,281,000**

Net assets:

Unrestricted

**2015**

161,419,000

**2014**

157,058,000



Temporarily restricted

**2015**

8,865,000

**2014**

9,803,000

**Total net assets**

**2015**

**170,284,000**

**2014**

**166,861,000**

**Total liabilities and net assets**

**2015**

**427,918,000**

**2014**

**420,142,000**

# CONSOLIDATED STATEMENTS OF ACTIVITIES

Years ended May 31, 2015 and 2014

## OPERATING:

CHANGE IN UNRESTRICTED NET ASSETS:

Revenue and support:

Subscriptions, newsstand, and other sales

**2015**

230,198,000

**2014**

237,280,000

Contributions

**2015**

27,278,000

**2014**

22,184,000

Net assets released from restrictions

**2015**

5,017,000

**2014**

4,923,000

Other

**2015**

539,000

**2014**

622,000

**Total revenue and support**

**2015**

**263,032,000**

**2014**

**265,009,000**

Operating expenses:

Publication, promotion, and marketing expenses:

Content development

**2015**

90,662,000

**2014**

88,827,000

Production and distribution
**2015**
46,165,000
**2014**
44,917,000

Promotion and marketing
**2015**
67,959,000
**2014**
74,478,000

---

**2015**
**204,786,000**
**2014**
**208,222,000**

Consumer advocacy and education
**2015**
16,368,000
**2014**
16,417,000

General and administrative
**2015**
23,829,000
**2014**
24,368,000

Fundraising
**2015**
9,805,000
**2014**
9,406,000

**Total operating and other expenses**
**2015**
**254,788,000**
**2014**
**258,413,000**

**Total operating income**
**2015**
**8,244,000**
**2014**
**6,596,000**

# NONOPERATING:

Investment return, net
**2015**
7,248,000
**2014**
26,330,000

Unrealized (loss) gain on interest rate swap
**2015**
(973,000)
**2014**
702,000

Change in value of split-interest agreements
**2015**
(2,917,000)
**2014**
782,000

Pension-related changes other than net periodic pension cost

**2015**

(7,241,000)

**2014**

9,642,000

---

**Total nonoperating (loss) gain**

**2015**

**(3,883,000)**

**2014**

**37,456,000**

---

**Increase in unrestricted net assets**

**2015**

**4,361,000**

**2014**

**44,052,000**

# CHANGE IN TEMPORARILY RESTRICTED NET ASSETS:

Grants received

**2015**

3,958,000

**2014**

7,135,000

Net assets released from restrictions

**2015**

(5,017,000)

**2014**

(4,923,000)



Contribution revenue – other

**2015**

126,000

**2014**

407,000

Change in value of split-interest agreements

**2015**

(5,000)

**2014**

121,000

**(Decrease) increase in temporarily restricted net assets**

**2015**

**(938,000)**

**2014**

**2,740,000**

Increase in net assets

**2015**

3,423,000

**2014**

46,792,000

**Net assets at beginning of year**

**2015**

**166,861,000**

**2014**

**120,069,000**

**Net assets at end of year**

**2015**

**170,284,000**

**2014**

**166,861,000**





## POLICY & ACTION FROM CONSUMER REPORTS

## About Us

Mission

**Board of Directors**

**Annual Report**

**Career Opportunities**

**Advocacy Privacy Policy**

**User Agreement**

Contact Us

Share Your Story

## Don't miss a thing

Your email

Zip code

Sign up

**Consumers Union**
101 Truman Avenue
Yonkers, NY 10703-1057
Phone: (914) 378-2000



**Southwest Office**
Consumers Union
CU Action Fund, Inc
7020 Easy Wind Drive, Suite 250
Austin, TX 78752
Phone: (512) 477-4431
Fax: (512) 477-8934

**Washington DC Office**
Consumers Union
1101 17th Street NW, Suite 500
Washington, DC 20036
Phone: (202) 462-6262
Fax: (202) 265-9548

**West Coast Office**
Consumers Union
1535 Mission Street
San Francisco, CA 94103-2512
Phone: (415) 431-6747
Fax: (415) 431-0906

# Board of Directors

**Diane Archer, Chair**
Founder and President, JustCare

**Thomas A. Wathen, Vice Chair**
Deputy Director
Pew Environment Group

**Deborah A. Cowan, Treasurer**
Chief Financial Officer and
Vice President of Finance
NPR

**Thomas C. Voice, Secretary**
Professor and Director,
Environmental Engineering Program
Michigan State University

**Joaquin Alvarado**
CEO
The Center for Investigative Reporting

**Marcia Aronoff**
Retired Senior Vice President for Programs
Environmental Defense Fund

**Robert E. Baensch**
Director, Publishing Programs

SUNY Global Center, New York

**Robert Anthony Benten**
Senior Vice President & Corporate Controller
The New York Times

**Anthony Iton, M.D.**
Senior Vice President, Healthy Communities
The California Endowment

**Carol Izumi**
Clinical Professor of Law
University of California,
Hastings College of the Law

**Annette LoVoi**
Director, Financial Access and
Asset Building Program
National Appleseed

**Heather McGhee**
President
Demos

**Ed Mierzwinski**
Consumer Program Director
United States Public Interest Research Group

**Craig Newmark**
Founder
craigslist and craigconnects.org

**Willard P. Ogburn**
Executive Director
National Consumer Law Center

**Martin Schneider**
Founder
Health Pages

**Betsy Scolnik**
Digital and Communications Strategist

**Micah Sifry**
Co-founder, Editor, and Curator
Personal Democracy Media



## To contact board members

**Write a letter addressed to the board member(s) care of:**
Board of Directors
Consumers Union
P.O. Box EMD
101 Truman Ave.
Yonkers, NY 10703

Meet Our Experts & Staff     Find a Resource

## Together We Can...

Get health coverage for every working family. Join our health team!
Buy safer products and save money at the same time. Check our ratings!
Stop new deceptive market practices before they spread. Tell us your experience!

Support Us
Please Donate



## Consumer Reports
Looking for product ratings or
magazine subscription?

Changing the
marketplace since 1936.



11/30/2015                                    Board of Directors | Consumers Union

Find an Expert     Find Research

About Us

About Us
Our Mission
News & Events
Blog
Career Opportunities

Consumer Reports Network

The Consumerist Blog
Safe Patient Project
Defend Your Dollars
Your Health Security
Not in My Food
Our Green Energy Future
Hear Us Now
Best Buy Drugs
Greener Choices

Privacy Policy     Terms of Use


5/5



## POLICY & ACTION FROM CONSUMER REPORTS

## **About Us**

Mission

Board of Directors

Annual Report

Career Opportunities

Advocacy Privacy Policy

User Agreement

Contact Us

Share Your Story

## **Don't miss a thing**

Your email

Zip code

Sign up

**Consumers Union**
101 Truman Avenue
Yonkers, NY 10703-1057
Phone: (914) 378-2000



**Southwest Office**
Consumers Union
CU Action Fund, Inc
7020 Easy Wind Drive, Suite 250
Austin, TX 78752
Phone: (512) 477-4431
Fax: (512) 477-8934

**Washington DC Office**
Consumers Union
1101 17th Street NW, Suite 500
Washington, DC 20036
Phone: (202) 462-6262
Fax: (202) 265-9548

**West Coast Office**
Consumers Union
1535 Mission Street
San Francisco, CA 94103-2512
Phone: (415) 431-6747
Fax: (415) 431-0906

# Mission

When confronted with critical decisions about the products and services that matter most, consumers are bombarded with an onslaught of marketing, advertising, opinions, and options. That's why for nearly 80 years, Consumer Reports has empowered consumers with the knowledge they need to make better and more informed choices—and has battled in the public and private sectors for safer products and fair market practices.

In short, we are dedicated to one enduring idea: *Unleashing the world-changing power of consumers*.

Formed as an independent, nonprofit organization in 1936, Consumer Reports serves consumers through unbiased product testing and ratings, research, journalism, public education, and advocacy. We stand firmly behind the principle that consumer products and services must be safe, effective, reliable, and fairly priced. We insist that manufacturers, retailers, government agencies, and others be clear and honest. We advocate for truth and transparency wherever information is hidden or unclear. We push companies to quickly address and remedy issues with their products and services.

Unconstrained by advertising or other commercial influences, we have relentlessly exposed landmark public health and safety issues and have strived to be a catalyst for marketplace changes. These issues have included increasing use of seat belts, reducing hospital-acquired infections, underscoring the dangers of cigarettes, spotlighting food- and water-safety issues, identifying vehicle-safety risks, advocating for consumer-finance protections and access to health care, and much more.

We connect with consumers through many channels, including our flagship *Consumer Reports* magazine and ConsumerReports.org website, the policy and advocacy work of Consumers Union, the money-savvy insights of *ShopSmart* magazine, and a range of issue-specific

publications and campaigns. Our experts put thousands of products to the test each year in our 50 state-of-the-art labs and 327-acre automotive testing track. Advocates in offices across the United States engage with more than 1 million online activists to push for improvements in the consumer marketplace. Our Technology Innovation Center in New York City develops new concepts for consumer-focused products and services. And our annual survey of more than 1 million subscribers captures vital feedback on purchasing decisions, experiences and shopping habits, helping us further our work to inform and protect.

Across everything we do, Consumer Reports unites impartial, trustworthy guidance with nearly eight decades of unwavering commitment to helping consumers make informed decisions. By solely focusing on the needs of consumers now and in the future, Consumer Reports serves as the gold standard for information and advocacy. Ultimately, our success lies in being a voice for —and giving a voice to—consumers.

Meet Our Experts & Staff      Find a Resource

## Together We Can...

Get health coverage for every working family. Join our health team!
Buy safer products and save money at the same time. Check our ratings!
Stop new deceptive market practices before they spread. Tell us your experience!

Support Us
Please Donate



### Consumer Reports
Looking for product ratings or
magazine subscription?

Changing the



3/4

Mission | Consumers Union

# marketplace since 1936.

Find an expert    Find Research

About CU

About Us
Our Mission
News & Events
Blog
Career Opportunities

Consumer Reports Network

The Consumerist Blog
Safe Patient Project
Defend Your Dollars
Your Health Security
Not in My Food
Our Green Energy Future
Hear Us Now
Best Buy Drugs
Greener Choices

**Privacy Policy**    **Terms of Use**



*Gay, et al. v. Tom's of Maine, Inc.*

| | | |
|---|---|---|
| | **CLAIM FORM** | |
| **Must be <u>received online</u> or <u>postmarked if mailed</u> no later than May 7, 2016.** | **TOM'S OF MAINE SETTLEMENT C/O DAHL ADMINISTRATION PO BOX 3614 MINNEAPOLIS MN 55403-0614** <br> Toll-Free: 1-888-897-9554 <br> Fax: 1-952-955-4589 <br> Website: www.TomsProductsClassAction.com | This is a two-sided Claim Form. All Sections of the Claim Form must be completed. |

**You can also file a claim online at:** www.TomsProductsClassAction.com.

---

**Section I - Class Member Information**

**Claimant Name:**

**Street Address:**

**City:**          **State:**     **Zip Code:**

**Email:**

**Preferred Phone Number:**

---

**Section II – Covered Products Included in this Settlement**

Covered Products that may be included on a valid Claim Form are any Tom's of Maine, Inc. toothpaste, deodorant/antiperspirant, soap, sunscreen, diaper cream, body wash, shampoo, hand/body lotion, lip gloss/shimmer, lip balm, mouthwash or any other personal or oral care product sold in the United States during the Class Period of March 25, 2009 to September 23, 2015, and which is labeled, advertised or promoted as "natural," or, in the case of deodorant/antiperspirant, is labeled, advertised or promoted as "naturally dry."

*[Please continue on the reverse side.]*

1



## Section III – Purchase and Product Information

| Covered Product(s) Purchased *(fill in all that apply)* | Location of Purchase | Number Purchased |
|---|---|---|
| ○ Toothpaste | _____ | _____ |
| ○ Antiperspirant/Deodorant | _____ | _____ |
| ○ Soap | _____ | _____ |
| ○ Lip Balm/Gloss | _____ | _____ |
| ○ Sunscreen | _____ | _____ |
| ○ Body Lotion | _____ | _____ |
| ○ Hand Cream | _____ | _____ |
| ○ Mouthwash | _____ | _____ |
| ○ Other (*name below*) | _____ | _____ |
| _____ | | |
| _____ | | |

*Note:* A Settlement Class Member is eligible to obtain $4.00 for each purchase of a Covered Product for up to 7 Covered Products purchased during the Class Period (up to $28 per person). However, the actual amount paid to individual claimants will depend upon the number of valid claims made.

## Section IV – Required Affirmation

**With my signature below I affirm that the information in this Claim Form is true and correct to the best of my knowledge, and that I purchased the Covered Products claimed above in the United States during the Class Period of March 25, 2009 to September 23, 2015 for personal or household use and not for resale.**

SIGNATURE: _____   DATE: _____

*Note: The Claim Administrator has the right to request verification or more information regarding the claimed purchase of Tom's Natural Products for purposes of preventing fraud. If the Class Member does not timely comply or is unable to produce documents or information to substantiate the Claim Form and the Claim is otherwise not approved, the Claim Administrator may disqualify the Claim.*

**All Claim Forms must be postmarked if mailed, electronically submitted online, or faxed by May 7, 2016 to:**

**Tom's Of Maine Settlement**          **www.TomsProductsClassAction.com   Fax#: 1-952-955-4589**
**C/O Dahl Administration**
**Po Box 3614**
**Minneapolis Mn 55403-0614**

Priority
Send  X
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only



FILED
CLERK, U.S. DISTRICT COURT

AUG 1 0 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

In re HOMESTORE.COM, INC. SECURITIES
LITIGATION

No. C01-11115-MJP (CWx)

ORDER GRANTING ATTORNEY'S
FEES TO OBJECTOR HELFAND

    This matter comes before the Court on Class Settlement Objector Steven Helfand's motion for attorney's fees and costs. Having reviewed the papers and pleadings submitted by the parties, the Court hereby grants the award of attorney's fees in the amount of $8,190 and costs in the amount of $595.55. This award is to come from the settlement fund.

    In order to justify an award of attorney's fees to an objector in a class action settlement, the objector must have conferred a substantial benefit on the class. Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1052 (9th Cir. 2002). Here, the Court finds that a substantial benefit was conferred on the class when Helfand raised serious questions about the timing of the class notice. As a direct result of Helfand's objections, the Court ordered that the class be re-noticed, on a finding that a strong likelihood existed that a substantial portion of the class would not have received timely notice of the class action settlement. This was crucial to the ability of the class members' ability to recover money from the general fund, as many members likely received notice after the due date for submission of proofs of claim. By bringing about re-notice of the class and extension of the due date, Helfand conferred a substantial benefit on the class.

ORDER ON ATTORNEY'S FEES - 1



DOCKETED ON CM

AUG 11 2004

BY                    013

562
(59)

1      On the other hand, Helfand offers no justification for a "multiplier" of two being applied to

2  this award. The Court will not grant this request.

3      The Court grants an award of attorney's fees in the amount of $8,190 and costs in the amount

4  of $595.55, to be drawn from the settlement fund.

5      The Clerk is directed to send a copy of this order to all counsel of record and to counsel for

6  the objectors to the partial class settlement.

7      Dated: August 10, 2004.

8                     /s/ Marsha J. Pechman
                         Marsha J. Pechman

9                        United States District Judge

ORDER ON ATTORNEY'S FEES - 2

AFL-CIO Union Plus benefits help current and
retired labor union members and their
families save money and support them
through major milestones, celebrations and
hardships. Learn More

| MONEY & INSURANCE | HOME & TECHNOLOGY | HEALTH | TRAVEL & ENTERTAINMENT | AUTO | EDUCATION & LEGAL | HARDSHIP HELP | REMINDER SERVICE | COLLECTIVE BARGAINS |
|---|---|---|---|---|---|---|---|---|

Search Union Plus                    FIND                              FOLLOW

UNION MEMBERS & FAMILIES: GET SPECIAL UNION DEALS NOW!

**Select your union:**

Select Union

OR, find your union by occupation

**Are you a Union Plus credit cardholder?**

Select Cardholder Status

**Provide an email:**

Email address

☑ Send me updates about discounts & benefits

View Privacy Policy

# ConsumerReports.org Discount

### Access your ConsumerReports.org Account

Log in to your ConsumerReports.org account here.

COMMENTS      EMAIL      PRINT

**ConsumerReports**

Subscribing gives **instant, unlimited access** to our exclusive, unbiased ratings and recommendations of products and services

Regular Annual Subscription Fee ~~$30~~

**Union Member Special: $22**

Click below to activate your subscription

This benefit requires you to identify your union affiliation to access it

**Top 5 reasons to subscribe to ConsumerReports.org**

1. Same great consumer advice found in *Consumer Reports Magazine* but with more interactive tools including updated recall and safety information

2. Latest lab-tested ratings on thousands of brand-name products and helpful shopping tips so you can buy the right products at the right price

3. Easy online access to Consumer Reports shopping advice and interactive tools 24 hours a day, 7 days a week - including a mobile site to use when shopping

4. Support a unionized company

5. Union members can subscribe to ConsumerReports.org for only $22 per year

6. Sample article: Avoid these home contractor scams

### Buying a car?

Read ConsumerReports free sample article: 16 common car buying mistakes

### Related Union Plus Programs



Goodyear



Union Plus Wireless Discount Program



Auto Buying Service

## What is ConsumerReports.org?

Want to be a more savvy consumer? Looking for objective, expert advice for product and service recommendations?

ConsumerReports.org is from Consumer Reports -- the nation's undisputed authority for providing unbiased Ratings and buying guides, and helping people get the most for their money

**For $22 per year, you can find out how to save hundreds of dollars per year.**

Because you or a family member is a union member, you can subscribe to ConsumerReports.org with your Union Plus 27% discount. Instead of the regular $30 Consumer Reports price, **union members pay only $22** for an annual subscription.

And the articles you read on ConsumerReports.org are full of ideas on how to save you money and deliver the value you deserve. Recent articles include:

- Strategies to save on your grocery bill
- Best used cars under $20,000
- How to cut your health costs
- How refrigerator thermometers save money
- Use frequent-flyer miles wisely

You can also access Consumer Reports on-the-go and make the smartest purchase with the mobile website. **Consumer Reports Mobile**: It's included for ConsumerReports.org subscribers.

- Easy-to-read mobile interface
- Product Ratings and images

### Union Leader Materials

- Leaders can order free bulk materials by calling the Union Plus Leader Line at 1-800-472-2005 or 202-293-5330 (M-F, 8:30 - 4:30 pm ET) in the Washington, D.C. metro area.

- Place an ad or article about Consumer Reports Online Discount in your union publication(s).

- Create a link to all your union's Union Plus benefits on your union's Web site.

- Print a handy Benefits guide and customize it with your local union's name.

- Union membership doesn't cost - it pays! Do you and your members know how much (on average) they could save annually if they used the Union Plus discounts? Calculate your savings now.



11/30/2015          Consumer Reports Online - Union Members Only ConsumerReports.org Access | Consumer Reports Discounts for Union Members | Union Plus

‣ Side-by-side product comparison

‣ No downloads - simply go to the ConsumerReports.org on your phone's browser

**Union-organized Consumer Reports**

ConsumerReports.org is published by Consumers Union, a non-profit organization which accepts no outside advertising, no free test samples, and has no agenda other than the interests of consumers. Consumers Union is union organized, with testers and writers represented by the Communications Workers of America (CWA). It's a perfect partnership with Union Plus benefits.

| ConsumerReports.org Discount Features | Sample Consumer Reports Articles | Eligibility | Customer Service |
|---|---|---|---|



| | Regular Rate | Union member special price |
|---|---|---|
| ConsumerReports.org annual subscription | $30.00 | $22.00 |

## Member Comments

On 03-16-15 said said:

*Until I retired union years, the membership $30 - paid $22. So if you want to save money, check unionplus.org ... I noticed from regular month for 2 line family plan. I GOT 16% OFF MY MONTHLY BILL.*

On 05-09-14 vera said:

*I have been a Consumer Reports member and subscriber for years and find it a valuable resource for getting the latest information about product reliability.*

On 04-16-14 said:

*I subscribed to Consumer Reports for ages, and before it could renew for another year at the old rate I called to have the Union Plus discount applied. It was no trouble at all, and I saved $8. All these savings are so no adding up.*



# CERTIFICATE OF SERVICE

I certify that a copy of Objection and Notice to Appear was:

      (X) mailed

      ( ) faxed and mailed

      ( ) hand delivered

      ( ) emailed

to the person listed below on November 30, 2015.

Other party or his/her/its attorney:

| | |
|---|---|
| Name: | Clerk of the Court |
| Address: | United States District Court |
| | Southern District of Florida |
| | 400 North Miami Avenue |
| City, State, Zip: | Miami, FL 33128 |
| Fax Number: | Unknown |
| Email Addressed: | Unknown |
| | |
| Name: | James C. Shah |
| | Shepherd, Finkelman, Miller & Shah, LLP |
| Address: | 35 E. State Street |
| City, State, Zip: | Media, PA 19063 |
| | |
| Name: | David K. Callahan |
| | Latham & Watkins LLP |
| Address: | 330 N. Wabash Avenue, Suite 2800 |
| City, State, Zip: | Chicago, IL 60611 |

Signature of Party: _____

Printed Name: Steven F. Helfand
Address: 1400 SW 137th Avenue, Apt. F112
City, State, Zip: Hollywood, FL 33027
Telephone Number: 415.596.5611
Email: sh4078@gmail.com

# PRIORITY
# MAIL ★

E OF DELIVERY SPECIFIED*

S TRACKING™ INCLUDED*

RANCE INCLUDED*

UP AVAILABLE

estic only

INTERNATIONALLY,
S DECLARATION
Y BE REQUIRED.

**FRO**

# PRIORITY
★ MAIL ★


**UNITED STAT**
**POSTAL SERVI**

VISIT US AT USPS.C
ORDER FREE SUPPLIES ON

**FROM:** STEVEN HELFAND
1400 SW 135TH AVE
APT F112
PEMBROKE PINES, FL 33027

**TO:** Clerk, US District C
400 North Miami A
Miami, FL 33128

FOR DOMESTIC AND INTERNATIONAL

Expected Delivery Day: 12/01/2015
**USPS TRACKING NUMBER**



9505 5127 4563 5334 1438 01


USPS INSPECTED
By

0 1000014

EP14F July 2013
OD: 12.5 x 9.5

# VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

UNI
POST